[No. 14272-4-II. Division Two. February 16, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES E. MCFARLAND, *Appellant*.

*Joe M. Quaintance*, for appellant (appointed counsel for appeal).

*John W. Ladenburg, Prosecuting Attorney*, and *James B. Roche, Deputy*, for respondent.

PETRICH, J.* — James McFarland appeals his convictions for burglary in the first degree, kidnap in the first degree, attempted robbery in the first degree, and as a felon in possession of a short firearm. He complains of prosecutorial misconduct, the failure to merge the crimes, and the insufficiency of the evidence. In his pro se brief, McFarland claims he received ineffective assistance of counsel because his attorney failed to challenge the legality of his arrest, which led to the seizure of inculpatory evidence, and failed to allow him to testify in his own behalf. We affirm.

---

*Judge John A. Petrich was a member of the Court of Appeals at the time oral argument was heard on this matter. He is now serving as a judge pro tempore of the court pursuant to CAR 21(c).

At about 10:30, on April 23, 1990, two masked men armed with sawed-off shotguns demanded entry into the home of Alan and Suzanne Rogers on South Yakima Avenue in Tacoma. Once in the home, they forced Alan and Suzanne to the living room floor at gunpoint while demanding money. Suzanne's mother, a recent stroke victim, was allowed to sit in a chair. When Alan responded that he did not have any money, the man standing over him, Pat Flick, kicked him in the ribs. Alan then unwillingly got up and went with the gunman into the dining room and thence to the kitchen. The gunman hit Alan on the side of the head with his shotgun, after which the gunman threatened to shoot him if he did not tell where the money was kept. After giving the gunman his wallet, Alan looked out from the kitchen into the living room. Without warning, the gunman hit him again on the back of the head with the shotgun and shoved him into the bedroom. The gunman then gave Alan 4 seconds with which to come up with the money or he would kill him. After pleading with the gunman, Alan grabbed a plastic bucket filled with change off his nightstand. He approached the gunman with the bucket, slid his hand into the bucket, pulled a small handgun out of it, grabbed onto the gunman's shotgun, and using the handgun, fatally shot him. Alan then went out to the living room only to face the second gunman, who after facing down Alan, backed out of the house. Somehow Suzanne had already escaped and was outside the house screaming for help. The second gunman fired his shotgun twice from the porch into the house, then rolled over the gate and eventually escaped down the alley between Yakima and Park Avenues.

The police arrived with a K-9 unit, which they used to follow the gunman's scent. They found a ski mask and tracked the scent to the end of the alley, where the gunman had apparently escaped in a car as evidenced by fresh tire tracks and a fresh oil leak. Several witnesses described the second gunman as about 6 feet tall, weighing 200 to 220 pounds and wearing dark clothing.

The police arrested James McFarland the next day, believing that he was the previously unidentified second gunman. Detective Lynch, who was providing surveillance of McFarland's residence, saw McFarland leave. Lynch, believing he had probable cause to arrest McFarland, radioed for assistance from uniformed officers, who stopped McFarland at 48th and Yakima, ordered him out of the car and onto the ground, arrested and handcuffed him, impounded his car, and took him to the police station. Detective O'Malley, who headed the investigation, interrogated McFarland. After reading McFarland his *Miranda*[1] warnings, O'Malley learned that McFarland had been with Flick until about 10:30 the night of the robbery. According to O'Malley, McFarland claimed to have gone with Flick to Flick's parents' house at about 9:30 where they drank a few beers and examined two shotguns. Flick then injected heroin and made a phone call, and then they left about 10:30. From there, the two men went to the 38th Street Pub Tavern, where Flick, carrying the two shotguns with him, transferred to another vehicle driven by a large white male. McFarland claims to have gone home, gotten a bite to eat, called his wife and gone to bed. His mother claims he arrived home between 10:40 and 10:45. She remembers the time because she was waiting for the television show "The Love Connection" to come on the air and had time to wash her hair first.

The ski mask that the police officers found in the alley contained eye holes, hair, and blood. Subsequent to McFarland's arrest and detention, the crime lab ran several tests on the blood and determined that the blood on the hat matched McFarland's blood to the degree that they could say only .4 percent of the population would have those blood characteristics. The detectives also learned that the location of the blood on the hat matched the location of a laceration on the back of McFarland's head. The police did not test McFarland's hair.

---

[1]Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

The State charged McFarland with first degree burglary, kidnapping, and attempted robbery, and as a felon with possession of a short firearm. After a CrR 3.5 hearing, the trial court found admissible McFarland's statements to Detective O'Malley made during an interview the day of the arrest. It, however, suppressed other statements McFarland made during trips to Tacoma General Hospital for the purpose of giving hair and blood samples, and for a scalp examination. Trial counsel challenged the State's efforts to obtain this physical evidence on grounds that it violated McFarland's right against self-incrimination and that there was insufficient probable cause to believe it was material evidence. Trial counsel did not move to suppress any of the evidence based on an illegal arrest.

## PROSECUTORIAL MISCONDUCT

McFarland contends that certain prosecutorial comments during the State's closing argument denied him a fair trial. No objections were raised during the State's argument and McFarland did not request curative instructions.

■ Absent objection to improper remarks during closing argument, "the issue of prosecutorial misconduct cannot be raised on appeal unless the misconduct is 'so flagrant and ill intentioned that no curative instructions could have obviated the prejudice engendered by the misconduct.' " *State v. Ziegler*, 114 Wn.2d 533, 540, 789 P.2d 79 (1990) (quoting *State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988)).

In *Ziegler*, the court ruled that the "prosecutor's remarks were not so flagrant that curative instructions could not have obviated any prejudice created" where no objections were made. 114 Wn.2d at 540. *See also State v. Lord*, 117 Wn.2d 829, 887, 822 P.2d 177 (1991) (prosecutor's exchange of vulgarities with defendant outside presence of jury insufficient to warrant new trial), *cert. denied*, 113 S. Ct. 164 (1992); *State v. Fowler*, 114 Wn.2d 59, 785 P.2d 808 (1990) (prosecutorial argument of evidence not at issue, though "highly inappropriate", could have been cured with instruction and, therefore, not flagrant or ill intentioned); *State v. Neslund*, 50 Wn. App.

531, 749 P.2d 725 (prosecutorial remark, which may have raised suspicions about defense counsel's integrity, did not prejudice defendant), *review denied*, 110 Wn.2d 1025 (1988); *State v. York*, 50 Wn. App. 446, 749 P.2d 683 (1987) (improper comment on defendant's credibility), *review denied*, 110 Wn.2d 1009 (1988); *State v. Guzman-Cuellar*, 47 Wn. App. 326, 338, 734 P.2d 966 (unobjected to statements "that this was an 'open and shut case', that the murder was a 'cold-blooded premeditated decision', that the prosecutor would 'feel perfectly comfortable' convicting Guzman even without the eyewitness testimony, and that 'the police did a wonderful job in this case,'" while improper, could have been cured with instruction), *review denied*, 108 Wn.2d 1027 (1987). *See generally State v. Barrow*, 60 Wn. App. 869, 872-73, 809 P.2d 209 (listing cases permitting prosecutorial comment on defendant's failure to produce evidence), *review denied*, 118 Wn.2d 1007 (1991); *State v. Blair*, 117 Wn.2d 479, 816 P.2d 718 (1991) ("missing witness" doctrine).

Here, McFarland contends that the prosecutor improperly commented on his assertion of his Fifth Amendment right not to bear witness against himself. The first such comment referred to McFarland's refusal to submit to a primer residue test after first agreeing to do so. The prosecutor commented:

> The defendant refused the primer residue test. Why? Why? Because he's got something to hide? Was he fearful that it might show that he had fired a shotgun? The man who fled the house fired a shotgun into the ceiling of this home as he was leaving. The defendant concerned that the test might show that residue on his person? What's he got to hide? That's an interesting point.

The prosecutor also commented on McFarland's admission that he handled the shotguns while at Flick's home before the crime occurred. The prosecutor said:

> He handled those guns, folks. Without any explanation as to why. Why? Why was he handling these guns with Mr. Flick? Did he offer any explanation as to why? This is April 24th, folks, this is the day after the event. Did he offer any explanation to the police as to why Mr. Flick had these guns, why he was handling them?

After questioning what McFarland and Flick were doing for the 30 to 45 minutes at Flick's parents' home, the prosecutor said:

> Very compelling here, folks. He has got no explanation. You think he would have asked. When he had an innocent purpose in his mind, do you think he might have asked Mr. Flick, Pat, what are you doing with these guns, why are you going with these things? He had the opportunity to explain that to the police, but he couldn't or he wouldn't.

The prosecutor then commented about McFarland's initial statements to the police:

> What about his behavior overall? Consistent with an innocent man? He first denied — let me put it this way. He never admitted initially he handled any guns, never admitted it. That caught Detective O'Malley's ear, when later we have got a shotgun shell that we have recovered, then and only then did the defendant say, well, I touched those guns; which can reasonably be interpreted to mean he handled them.

The testimony supporting the prosecutor's comments came from Detective O'Malley who talked with McFarland after properly informing him of his *Miranda* rights.

The first inquiry a reviewing court must make when the defendant asserts that the prosecutor improperly commented upon his postarrest silence is whether there was a violation of the rule in *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). Because *Miranda* warnings carry an implicit assurance that a defendant's silence will carry no penalty, the *Doyle* Court held that a prosecutor's comments about the defendant's unwillingness to explain his innocence at the time of arrest was improper. The Court found that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619. The second inquiry, presuming that a *Doyle* situation exists, is to ask whether the trial court *permitted* the prosecution to undertake impeachment on the defendant's silence or *permitted* the prosecutor to call attention to the defendant's silence. *Greer v. Miller*, 483 U.S. 756, 764, 97 L. Ed. 2d 618, 107 S. Ct. 3102 (1987).

■ Here, a *Doyle* inquiry does not apply because McFarland waived his Fifth Amendment rights and did not subsequently invoke his right to remain silent. Specifically, his refusal to take the primer residue test came after *Miranda* and after agreeing to submit. Only then did he invoke his *Miranda* rights. His failure to make explanations about the guns resulted from statements he made after being mirandized in which he apparently hoped to provide an explanation for his prints being on the guns, thinking that the officer had such information. Also, the trial court instructed the jury that the defendant did not have to testify and that "[n]o inference of guilt or innocence is to be drawn by you from the fact that the Defendant does not testify in this case." *See also State v. Bradfield*, 29 Wn. App. 679, 685, 630 P.2d 494 ("nonstatements" of defendant admissible when, after being mirandized, he gives limited factual information to the police), *review denied*, 96 Wn.2d 1018 (1981).

■ McFarland also uses the prosecutor's questioning during the direct examination of Detective Finch as an example of misconduct. One of the prosecution's tactics at trial was to show that the defendant's story could not be true because of inconsistencies in the timing of the events. McFarland presented the testimony of Lorraine Smasal, McFarland's mother, that McFarland arrived home between 10:40 and 10:45. The 911 call from the Rogers' residence was at 10:42. Thus, her testimony provided an alibi for her son. The prosecution brought in Detective Finch as a rebuttal witness. Finch had served a search warrant on Smasal's residence on April 25, the day after the shooting. The prosecutor sought to elicit testimony from Finch that Smasal's testimony was suspect because of her attitude, *i.e.*, belligerent and hostile, and because of inconsistencies in her testimony. The remarks of the court to the prosecutor, as noted in McFarland's brief, were in the context of the prosecutor's attempt to elicit such testimony. McFarland's objections were sustained and the State was not allowed to pursue its line of questioning. It is noteworthy that the court instructed the jury to disregard any inference from the question, and out of the presence of the

jury, McFarland requested that the prosecutor's remarks be stricken. The court said, "When the jury comes back, you make that motion". No such motion was made. *See State v. Kroll*, 87 Wn.2d 829, 835, 558 P.2d 173 (1976) (jury is presumed to follow court's instruction to disregard prosecutor's remark).

McFarland also contends that the prosecutor improperly commented on the evidence. The prosecutor remarked:

> Now, what was he doing with Mr. Flick during the 30 to 45 minutes that the Seibers told he was in the home? What was he doing up there? Was it just Mr. Flick shooting up heroin, as the defendant told the police? Maybe he had a few beers. Were they planning this crime? He spent that time along with Mr. Flick. I think maybe they were cutting some eyeholes in some hats. Talking about the crime.

■ The test we apply in viewing these remarks was set out in *State v. Swan*, 114 Wn.2d 613, 664, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046 (1991):

> It is, of course, improper for a prosecutor to express a personal opinion about the credibility of a witness during closing argument. However, prejudicial error does not occur until it is clear that the prosecutor is not arguing an inference from the evidence, but is expressing a personal opinion.

(Footnotes omitted.) Here, the prosecutor's remark is a reasonable inference from the evidence. After Flick picked McFarland up the evening of the fateful event, they went to Flick's parents' house and were there 30 to 45 minutes, during which Flick brought out two shotguns. Less than an hour later, Flick was dead at a different house, wearing a ski mask, and lying on top of one of the shotguns. Flick's partner in the crime also had a shotgun and wore a ski mask. We find no reversible error.

### DOUBLE JEOPARDY: MERGER OF CHARGES

McFarland contends that he was improperly convicted of attempted robbery and kidnapping in violation of the double jeopardy clause of the Fifth Amendment. He asserts that his alleged behavior at the crime scene was criminal conduct constituting one actual offense of attempted robbery to which

the alleged kidnapping was incidental and necessary to the robbery.

 The fifth amendment to the United States Constitution provides: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . .". The Washington Constitution, article 1, section 9, declares: "No person shall be . . . twice put in jeopardy for the same offense". Because of the similarity of these provisions, the language of the state constitution receives the same interpretation as that which the United States Supreme Court gives to the jeopardy provision of the federal constitution. *State v. Schoel*, 54 Wn.2d 388, 391, 341 P.2d 481 (1959) (double jeopardy clauses are identical in thought, substance, and purpose); *State v. Netling*, 46 Wn. App. 461, 463, 731 P.2d 11, *review denied*, 108 Wn.2d 1011 (1987).

The double jeopardy clause provides three related protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." (Footnotes omitted.) *North Carolina v. Pearce*, 395 U.S. 711, 717, 23 L. Ed. 2d 656, 89 S. Ct. 2072, 89 S. Ct. 2089 (1969), *overruled on other grounds in Alabama v. Smith*, 490 U.S. 794, 104 L. Ed. 2d 865, 109 S. Ct. 2201 (1989).

The primary flaw in McFarland's analysis is his reliance on cases where the prosecution sought to try a defendant on a related charge after a verdict had already been rendered. For example, in *Grady v. Corbin*, 495 U.S. 508, 109 L. Ed. 2d 548, 110 S. Ct. 2084 (1990), the Court held that the State's attempted prosecution for homicide and assault violated the double jeopardy clause when the State had previously accepted the defendant's pleas of guilty for driving while intoxicated and failing to keep to the right of the median. Because proof of homicide and assault necessarily involved proof of driving while intoxicated or of failing to keep to the right of the median, the Court found a double jeopardy violation because the State would be proving conduct that constituted an offense for which the defendant had already

been prosecuted. *See also State v. Laviollette*, 118 Wn.2d 670, 675-79, 826 P.2d 684 (1992) (*Blockburger*[2] test is first prong of 2-prong analysis required under *Grady* when question is one of constitutionality of subsequent prosecution). *But see United States v. Dixon*, 509 U.S. 688, 125 L. Ed. 2d 556, 113 S. Ct. 2849 (1993) (overrules *Grady*; test is same elements; does not include same conduct test).

■■ In *State v. Vladovic*, 99 Wn.2d 413, 423, 662 P.2d 853 (1983), the court said:

> This court has repeatedly rejected the notion that offenses committed during a "single transaction" are necessarily the "same offense". *State v. Roybal*, 82 Wn.2d 577, 512 P.2d 718 (1973). In order to be the "same offense" for purposes of double jeopardy the offenses must be the same in law and in fact. If there is an element in each offense which is not included in the other, and proof of one offense would not necessarily also prove the other, the offenses are not constitutionally the same and the double jeopardy clause does not prevent convictions for both offenses. *Roybal*, at 581.
>
> A review of the robbery and kidnapping statutes involved in the instant case reveals that each offense includes an element not included in the other. The elements of robbery, as charged in this case, are: (1) a taking of personal property (2) from the person or in one's presence (3) by the use or threatened use of force, or violence, or fear of injury, (4) such force or fear being used to obtain or retain possession of the property, and (5) displaying what appears to be a deadly weapon. . . . RCW 9A.40.020(1)(b). "Abduct" means to restrain the victim's movements without his consent by use or threatened use of deadly force. RCW 9A.40.010(1) and (2). In order to prove robbery, the State must prove a taking of property, which is not an element of kidnapping. To prove kidnapping, the State must prove the use or threatened use of "deadly force". Robbery does not include an element of "deadly force" but only requires a taking by "force" and the display of what appears to be a deadly weapon. Since each offense includes an element not included in the other and proof of one does not necessarily prove the other, the offenses are not the same under *Roybal*. Accordingly, double jeopardy does not prohibit petitioner's convictions for both offenses.

(Citations omitted.) *Vladovic*, at 423-24. *See also In re Fletcher*, 113 Wn.2d 42, 46-50, 776 P.2d 114 (1989) (first

---

[2]*Blockburger v. United States*, 284 U.S. 299, 304, 76 L. Ed. 306, 52 S. Ct. 180 (1932).

degree kidnapping and first degree robbery do not merge). We find no error.

## SUFFICIENCY OF THE EVIDENCE

■ McFarland next challenges the sufficiency of the evidence in support of his convictions. In determining whether sufficient evidence supports a conviction, "[t]he standard of review is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt." *State v. Rempel*, 114 Wn.2d 77, 82, 785 P.2d 1134 (1990) (citing *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)). Under this standard, we resolve all inferences in favor of the State. *State v. Smith*, 104 Wn.2d 497, 507, 707 P.2d 1306 (1985). Here, in reviewing the sufficiency of the evidence presented, we must examine the evidence admitted at trial as though it were properly admissible as the record discloses no claimed trial court errors.

The central issue at trial was one of identity; *i.e.*, was McFarland Flick's accomplice? The State presented evidence that Flick would only have committed this crime with someone in whom he had confidence, that he had a small group of friends, and that McFarland was in that small group. Four witnesses gave descriptions of the perpetrator similar to McFarland's, *i.e.*, 6 feet 0 inches to 6 feet 2 inches weighing 200 to 220 pounds. These witnesses testified that the accomplice wore a dark jacket and dark Levis. According to McFarland's mother's testimony, McFarland had on a brown leather jacket and dark Levis that night. The State also introduced into evidence a ski mask found at the scene that contained blood and hair. Forensic tests indicated that only a .4 percent chance existed that the blood was not McFarland's. Furthermore, the blood and hair found on the hat were in the same location as a laceration on McFarland's head. The State also presented evidence that McFarland's car leaked oil and that a fresh oil puddle was found at the spot where the getaway car was most likely parked. In

addition, Detective O'Malley testified that McFarland admitted to being with Flick up until 12 minutes before the emergency call to 911 was made; that in the time before the crime occurred, he was with Flick; that they had two shotguns in the car; and he admitted handling both guns in the car and at Flick's parents' house.

■ McFarland contends that the absence of fingerprints, footprints, plaster dust in McFarland's car and on his clothes, the failure of the State to make a hair comparison test, and the evidence that this was a drugrelated execution preclude a finding that McFarland committed the offense beyond a reasonable doubt. While there is an absence of any direct identification of McFarland at the scene of the crime, the circumstantial evidence is such as would allow the jury to infer beyond a reasonable doubt that McFarland committed the offenses for which it found him guilty.

■ In so far as the charge of possession of a short firearm is concerned, Alan Rogers testified that the two men who came into his house both carried sawed-off shotguns, one gun a single shot, the other a pump action. This is also consistent with O'Malley's testimony that McFarland said Flick had two guns, one a single shot and one a pump action. Hence, because a reasonable jury could have found that McFarland was Flick's partner in the crime, it could easily have found that he had possession of a short firearm. Even assuming a failure of this evidence, McFarland's statements to O'Malley that he touched the guns at Flick's parents' house, that Flick brought the guns along, and that they "handled" the guns en route to the Pub Tavern support a finding of constructive possession. Also, McFarland constructively possessed the guns because he knowingly transported them in his car. *State v. Reid*, 40 Wn. App. 319, 325-26, 698 P.2d 588 (1985) (evidence that defendant knew weapons were in his car sufficient to send issue to jury on question of actual or constructive possession of a deadly weapon).

INEFFECTIVE ASSISTANCE OF COUNSEL

The Washington State and United States Constitutions guarantee a criminal defendant the right to effective assistance of counsel. Const. art. 1, § 22 (amend. 10); U.S. Const. amend. 14, § 1. The test for ineffective assistance of counsel has two parts. One, it must be shown that the defense counsel's conduct was deficient, *i.e.*, that it fell below an objective standard of reasonableness. Two, it must be shown that such conduct prejudiced the defendant, *i.e.*, that there is a reasonable possibility that, but for the deficient conduct, the outcome of the proceeding would have been different. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987) (adopted test from *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)).

In reviewing this type of challenge, this court must presume that the assistance was effective. *State v. Sardinia*, 42 Wn. App. 533, 539, 713 P.2d 122, *review denied*, 105 Wn.2d 1013 (1986). Generally, a court will not consider matters it regards as tactical decisions or matters of trial strategy as ineffective assistance. *State v. Carter*, 56 Wn. App. 217, 224, 783 P.2d 589 (1989). "If defense counsel's trial conduct can be characterized as legitimate trial strategy or tactics, then it cannot serve as a basis for a claim that the defendant did not receive effective assistance of counsel." *State v. Mak*, 105 Wn.2d 692, 731, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986); *State v. Adams*, 91 Wn.2d 86, 90-91, 586 P.2d 1168 (1978); *State v. White*, 81 Wn.2d 223, 225, 500 P.2d 1242 (1972).

McFarland contends in his pro se brief that his trial counsel was ineffective because he failed to make a motion to suppress his inculpatory statements and the evidence seized as a result of his illegal arrest. Relying on *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979), McFarland contends that his arrest was unlawful. In *Dunaway*, a police officer had information from an informant that implicated the petitioner in an attempted robbery/murder at a pizza parlor. The detective, knowing that he did not have "enough information to get a warrant"

ordered other detectives to pick up the petitioner and bring him in. He was taken into custody, never told he was under arrest, restrained, given his *Miranda* warnings, and questioned. He made incriminating statements, and he drew sketches, which later led to his conviction. The Supreme Court held that Dunaway was seized without probable cause in violation of the fourth amendment to the United States Constitution. The Court reiterated the principle set out in *Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975) that a finding of voluntariness under the Fifth Amendment does not satisfy the Fourth Amendment requirements. The question under the Fourth Amendment is whether the "statements were obtained by exploitation of the illegality of his arrest". *Dunaway*, at 217 (quoting *Brown*, 422 U.S. at 600). Hence, the trial court's finding that McFarland's inculpatory statements were voluntary satisfied the Fifth Amendment requirements but did not address the issue now raised under the Fourth Amendment.

█ Here, the police did not have a warrant for McFarland's arrest. They believed, however, they had probable cause to arrest him, and they did arrest him. Then, as the trial court found, they gave him *Miranda* warnings before he made any inculpatory statements. The failure to urge objections at trial on the basis of the Fourth Amendment constitutes a waiver of the right to challenge the admission of illegally or unconstitutionally seized evidence. *State v. Valladares*, 31 Wn. App. 63, 76, 639 P.2d 813 (1982), *rev'd in part on other grounds*, 99 Wn.2d 663, 664 P.2d 508 (1983). Thus, based upon the record before us, McFarland's counsel's failure to challenge the validity of his arrest amounted to a waiver of McFarland's Fourth Amendment rights. Again, based upon the record before us, this waiver of his client's right cannot be said to be a tactical decision or sensible trial strategy and, thus, was ineffective assistance.

█ This case is similar to *State v. Tarica*, 59 Wn. App. 368, 374, 798 P.2d 296 (1990), where the defendant made a Sixth Amendment claim of ineffective assistance of counsel

for his counsel's failure to make a suppression motion under the Fourth Amendment. The court there said:

> As a normal rule, defense counsel brings such a motion anytime there may be a question as to the validity of a search and subsequent seizure. Because the motion is made pretrial and not in front of the jury, there does not appear to be any way to characterize the failure to bring the motion to suppress as a legitimate trial tactic. Therefore, Tarica's counsel's performance was deficient.

59 Wn. App. at 374. Similarly here, the record shows no tactical reason for McFarland's counsel not to challenge the validity of the arrest in light of the facts and circumstances surrounding that arrest. That does not end our inquiry, however. "The next question is whether the defense was prejudiced by failure to bring the motion. Analysis of that question requires an examination of whether the motion to suppress would have been granted had it been made." *Tarica*, at 374.

> Probable cause to arrest exists:

> when an officer has reasonable grounds to believe a suspect has committed or is committing a crime based on circumstances sufficiently strong to warrant that conclusion. The test is one of reasonableness, considering the time, place, and circumstances and the officer's special expertise in identifying criminal behavior.

*Tarica*, at 376-77 (quoting *State v. Gonzales*, 46 Wn. App. 388, 395, 731 P.2d 1101 (1986)). The validity of an arrest is determined by objective facts and circumstances. *Beck v. Ohio*, 379 U.S. 89, 96, 13 L. Ed. 2d 142, 85 S. Ct. 223 (1964); *State v. Huff*, 64 Wn. App. 641, 645, 826 P.2d 698, *review denied*, 119 Wn.2d 1007 (1992). An arrest not supported by probable cause is not made lawful by an officer's subjective belief that an offense has been committed. *Carroll v. United States*, 267 U.S. 132, 161-62, 69 L. Ed. 543, 45 S. Ct. 280, 39 A.L.R. 790 (1925); *Huff*, 64 Wn. App. at 645-46.

We cannot determine from the record before us whether the motion to suppress would have been granted. This determination involves matters not argued below and not made part of

the record on appeal.[3] "[W]ith respect to the matters outside of the record about which defendant complains the only remedy is to bring an independent proceeding by way of personal restraint petition under RAP 16.3." *State v. King*, 24 Wn. App. 495, 505, 601 P.2d 982 (1979).

Judgment affirmed.

MORGAN, C.J., and ALEXANDER, J., concur.

After modification, further reconsideration denied March 16, 1994.

Affirmed in part and vacated in part at 127 Wn. 2d 322.

---

[3]McFarland filed a motion to obtain transcripts of several pretrial proceedings on August 31, 1993. This motion was filed after the briefs were filed and after oral argument. We have considered his arguments and the motion is denied, without prejudice to his right, if any, to seek such transcripts as might be needed in connection with a personal restraint petition.