# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

THE STATE OF WASHINGTON,

Respondent,

v.

GIOVANNI DASHAWN HERRIN,

Appellant.

No. 85768-1-I

DIVISION ONE

UNPUBLISHED OPINION

BIRK, J. — Giovanni Herrin appeals his conviction, arguing (1) the trial court abused its discretion when it declined to dismiss his murder charge due to cumulative governmental misconduct, (2) the trial court erred by not excluding certain witnesses and evidence as a lesser available remedy, (3) the State impermissibly commented on his right to prearrest silence, (4) the trial court erred in admitting evidence of flight to show consciousness of guilt, (5) cumulative error, and (6) the community custody condition requiring Herrin to remain within geographic boundaries was unconstitutionally vague. Finding no error, we affirm.

I

The State charged Herrin by information with murder in the first degree of Karyme Barreto-Sabalza, felony murder with the predicate offense of robbery in the first degree, unlawful possession of a firearm in the first degree,[1] and escape

---

[1] In a bifurcated bench trial, the trial court acquitted Herrin of unlawful possession of a firearm in the first degree.

in the second degree.[2]  After two mistrials—which will be discussed below—the following testimony was elicited at Herrin's third trial.

Josefina Castello testified that on June 16, 2018 she watched a male and female walk into the wooded area of Salt Air Vista Park.  Castello testified that after about 30 seconds, she heard a loud boom that she thought was a gunshot, walked out of her house, and saw the male walk quickly out of the woods.  Castello watched the male enter a white Nissan Altima.  Elijah Maile testified that he was playing basketball at another park when he heard two or three gunshots coming from Salt Air Vista Park.  Maile ran toward the park, and along the way saw someone he recognized as a family friend leaving the area in a white four-door vehicle.  Maile testified that the person he saw was associated with a person he knew as "Antonio."

Officers were dispatched to Salt Air Vista Park to conduct a welfare check. An individual had called and reported a woman lying in the woods unconscious with something covering her face.  Upon arrival, officers saw a woman lying on the ground with a blindfold over her eyes, blood along her face and head, with an "obvious injury" by her left ear.  The woman was declared dead at the scene after rescue efforts failed.  The medical examiner opined the cause of death was a gunshot wound to the side of the head.

Kent Police Detective Daniel Yagi testified he began searching for a white Nissan in the area, and memorized the license plate number of a Nissan Altima

---

[2] The escape charge was severed from the other two charges.  Herrin pleaded guilty to escape in the second degree.

that he observed. Yagi testified he investigated "Antonio" and learned that Antonio and Herrin were brothers. Detective Yagi further discovered that Herrin was associated with Barreto-Sabalza. Detectives ran the license plate of the Nissan and learned that it was registered to the Barreto family, and Herrin was associated with the vehicle. Officers pulled up Barreto-Sabalza's department of licensing photo and, after confirming with her family, determined she was the victim found in the woods.

The day after the murder, Alicia Perez met with Herrin to discuss the murder. Herrin told Perez that Barreto-Sabalza's family told him that someone took Barreto-Sabalza to the woods, blindfolded her, and shot her in the head. Herrin also told Perez that Barreto-Sabalza's car was missing and that the police did not find photo identification, a wallet, or a phone on her. The police had not disseminated that information to the public.

Kent Police Detective Lovisa Dvorak testified that three days after the murder she received information that Barreto-Sabalza's Nissan Altima was located at a residence in South Seattle. The detective subsequently received word that the vehicle was driving away from that residence, so she and another detective began to pursue the vehicle. The detectives performed a pursuit intervention technique to stop the vehicle and arrested the driver, who was identified as Herrin.

Police transported Herrin to the station for a recorded interview in which Herrin provided inconsistent accounts for how the murder occurred. In the first account, Herrin accused Montae Rainwater of murdering Barreto-Sabalza, and claimed he was not present. In the second account, Herrin stated Rainwater

3

murdered Barreto-Sabalza while Herrin was present. After a break, Herrin provided a third statement in which he said his younger brother Antonio killed Barreto-Sabalza.

Based on Herrin's statements, Detective Dvorak interviewed Rainwater. The detective also interviewed Rainwater's girlfriend, Jasmyn Dickerson, and her mother, Karen Dickerson. Both Karen[3] and Jasmyn testified that on June 16, 2018 they attended a barbecue with Rainwater in Tacoma from approximately 1:00 p.m. until approximately 8:30 to 9:30 p.m. Karen drove to the party in her vehicle. Karen testified that to her knowledge, Rainwater did not leave the party, which Jasmyn corroborated.

The jury convicted Herrin of murder in the first degree. The trial court sentenced Herrin to 37 years in prison, and 36 months of community custody upon release. The sentence on one of Herrin's convictions included a term of community custody. In "Appendix H" to the judgment and sentence, the court ordered that Herrin comply with eight community custody conditions, including that Herrin "[r]emain within geographic boundaries, as set forth in writing by the Department of Corrections Officer or as set forth with [Stay Out of Drug Area] order." Herrin appeals.

II

Herrin argues the trial court abused its discretion in denying his CrR 8.3(b) motion to dismiss because of cumulative governmental misconduct. We conclude

---

[3] For clarity, we use first names to refer to Karen and Jasmyn Dickerson. We do not intend disrespect.

4

that the trial court acted within its discretion in denying Herrin's motion because he has not established actual prejudice.

We review a trial court's decision on a motion to dismiss under CrR 8.3(b) for abuse of discretion. State v. Koeller, 15 Wn. App. 2d 245, 251, 477 P.3d 61 (2020). A court abuses its discretion where its decision is manifestly unreasonable, or rests on untenable grounds or was made for untenable reasons. Id. CrR 8.3(b) provides that a "court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." Thus, a movant must show by a preponderance of the evidence (1) arbitrary action or misconduct by the government, and (2) prejudice affecting the movant's right to a fair trial. Koeller, 15 Wn. App. 2d at 251; State v. Kone, 165 Wn. App. 420, 432-33, 266 P.3d 916 (2011). Dismissal under CrR 8.3(b) is an "extraordinary remedy" and should be granted "only as a last resort." State v. Brooks, 149 Wn. App. 373, 384, 203 P.3d 397 (2009). Dismissal is available "only when there has been prejudice to the rights of the accused which materially affected the rights of the accused to a fair trial and that prejudice cannot be remedied by granting a new trial." State v. Baker, 78 Wn.2d 327, 332-33, 474 P.2d 254 (1970).[4]

---

[4] Citing State v. Michielli, 132 Wn.2d 229, 240, 937 P.2d 587 (1997), Herrin argues that governmental misconduct in the form of discovery and other delays impermissibly forced him to choose between his right to a speedy trial and his right effective assistance of counsel. Herrin's argument is flawed because he bases his prejudice in the delays he says resulted from the State's serial disclosures, but relies on case law almost predating 2003 amendments to CrR 3.3 that, subsequent decisions have held, foreclose time-to-trial arguments as a basis for dismissal

A

1

In Herrin's first trial, Maria Nuñao Gallegos testified that she lives just down the street from the park. On the day of the murder she saw a man in a white Nissan drive by her. The State asked her to describe the individual, and Nuñao Gallegos responded, "He was white-skinned. Having this person in front of me makes me feel nervous." Herrin moved to strike the response, and the trial court instructed the jury to disregard the statement. Outside the presence of the jury, Herrin moved for a mistrial, which the trial court denied.

On the third day of trial, Detective Gerald Gee testified about Herrin's police interrogation. The State admitted the audio recording of Herrin's interrogation, and discovered the recording was improperly redacted, allowing the jury to hear Herrin say that he had been "doing robberies" since he was nine years old. Herrin filed a second motion for a mistrial, which the trial court granted because "[a] redaction that the court deem[ed] was prejudicial was missed in the audio statement of the defendant."

2

During Herrin's second trial, the State disclosed that Maile had made some disclosures to the State in the presence of Detective Dvorak about the untruthfulness of his prior statements. The trial court granted Herrin's request to interview Maile after the court was in recess for the day, and ruled that Maile's

under CrR 8.3(b). With regard to time to trial, Herrin was required to show a violation of CrR 3.3, a statute, or the state or federal constitution, none of which was shown. See CrR 3.3(h).

cross-examination would begin the following day. During his interview, Maile stated that he and Detective Dvorak went through Maile's previous statements and the detective identified inconsistencies between the statements, told him that certain things in the statement did not make sense, and admonished him to just tell the truth. After the conversation with the detective, Maile stated that he went through and disavowed additional statements from his defense interview. Detective Dvorak stated she met with Maile, but she did not endorse the level of discussion about his testimony that Maile had described.

Herrin filed a CrR 8.3(b) motion to dismiss "due to governmental misconduct in irreparably tainting witness [Maile] with excessive coaching and cueing," or alternatively, requested the court grant a mistrial and suppress Maile's testimony at a subsequent trial. Herrin further argued that dismissal was warranted because Maile was present in the hallway outside the courtroom when Herrin entered, handcuffed and "flanked by three officers." The trial court denied Herrin's motion to dismiss and suppressed Maile's in-court identification.

At trial, Detective Dvorak testified about her communication with Rainwater, the individual that Herrin had accused of killing Barreto-Sabalza. Detective Dvorak testified that Rainwater told her his whereabouts on the day of the murder, and she also spoke with his girlfriend Jasmyn, and his mentor Falshan Langston. Herrin elicited that in a previous defense interview, Detective Dvorak had explicitly stated that she had not interviewed Langston about Rainwater's alibi and failed to mention that she had verified Rainwater's alibi with Jasmyn, which contrasted with her direct examination testimony. Detective Dvorak testified that she did not

7

personally notify defense counsel of her interview with Langston. Herrin cross-examined Detective Dvorak about Rainwater's statement that he was at his girlfriend's aunt's house on the day of the murder, and questioned Detective Dvorak as to whether she spoke to the aunt or determined her address. The detective indicated, "[W]e did have that information." Herrin directed the detective to her previous interview and asked, "And you did not document [the aunt's name] in your report, either, did you?" Detective Dvorak responded that she had documented it, and "[i]t was in a Word doc[ument] and it wasn't transferred over," another fact she had not disclosed to the defense during the interview. Detective Dvorak testified, "I believe I explained that to you guys in this interview after—after this initial line of questioning. I write my reports in a Word doc[ument]. My laptop eventually essentially blew up and fried and no digital forensic experts were able to get that."[5]

Herrin also objected to Todd Plumb, a retired firefighter, being called as a witness, asserting a discovery violation. Herrin argued that he was not provided any medical or narrative reports from Plumb and learned the previous night that there was a report Plumb had used to prepare for testifying. Herrin argued he had been surprised by the information and prejudiced because it had not been provided in a timely fashion. As a remedy, the trial court allowed Herrin to interview Plumb before he testified.

---

[5] Before the remainder of the detective's cross-examination, Herrin made a request to interview her regarding the police reports that were on the destroyed laptop, which the trial court granted.

8

Herrin filed a renewed CrR 8.3(b) motion to dismiss and argued there was governmental misconduct by Detective Dvorak for failing to document or disclose the discovery of missing files, and misconduct by the State for failing to disclose that information to the defense. Herrin contended he was prejudiced because he was led to believe he did not need to interview certain witnesses, there was contact information he did not obtain, and he was surprised by Detective Dvorak's testimony that she interviewed Langston as an alibi witness for Rainwater. The trial court denied the motion to dismiss and instructed the jury that it should disregard all reference to incomplete or lost police reports and any investigation documented, and should not give weight to any such testimony or evidence.

After the jury found Herrin guilty of murder in the first degree, Herrin moved to dismiss based on cumulative prosecutorial misconduct, and argued that the curative instruction was inadequate to cure the prejudice caused by the State's discovery violations. The trial court denied a mistrial and denied the motion to dismiss. But the trial court reconsidered its ruling and held another hearing on Herrin's motion to dismiss. The court ruled it was not dismissing the charge because "exculpatory evidence was not withheld in this case and prosecutorial misconduct and prosecutorial error does not make it so that [Herrin] is precluded from having a fair trial in the future." The trial court found that Herrin was denied information regarding the scope of Detective Dvorak's investigation into Rainwater's alibi witnesses, which was critical to the defense case, and the court's instruction to the jury to disregard part of the detective's testimony was insufficient to cure the prejudice. The trial court further found that the State's failure to provide

9

Herrin with Plumb's testimony until 15 minutes before he testified substantially prejudiced Herrin's preparation for trial. Thus, the trial court granted Herrin's motion for a mistrial.

3

Before the third trial, the court held an omnibus hearing. Herrin objected to the new witnesses and discovery that the State had provided since the trial date had been reset. The trial court excluded certain witnesses and evidence and reserved ruling on other evidence, including Karen and Jasmyn's testimony, as well as photos from Jasmyn that supported Rainwater's alibi.

At a hearing on the parties' supplemental motions in limine, Herrin re-raised the issues that had been reserved at the omnibus hearing. Herrin argued Karen's testimony should be excluded because he was concerned that her testimony would not be based on her own recollection, but instead would be influenced by Jasmyn and the State. Herrin argued that during the defense interview, Karen had texted Jasmyn about the key issue of what date the barbecue had taken place and the State had separately corrected Karen about the date. The trial court denied the motion and found that Karen's testimony was not irreparably tainted and could be explored during cross-examination. Herrin, while acknowledging he had previously interviewed her, also moved to exclude Jasmyn's testimony because the State did not previously list her as a witness and moved to exclude the photographs she provided of herself and Rainwater at a party at the date and time of the homicide, as well as a video taken on the same day. Herrin argued the photographs and the video should be excluded as late discovery. The trial court

denied the motion to exclude Jasmyn's testimony, denied the motion to exclude Jasmyn's photographs and Snapchat[6] video, and granted the motion to exclude Jasmyn from identifying any voices from the video. As to the photographs and video evidence, the trial court found Herrin was not prejudiced because the defense had reasonable notice of the evidence and the timing of the disclosure did not impact the defense's ability to prepare for trial.

B

Herrin argues the State engaged in cumulative misconduct and points to: (1) Nuñao Gallegos's identification testimony, (2) the State's improper redaction of Herrin's interrogation, (3) Maile's improper coaching and staging outside the courtroom,[7] (4) Detective Dvorak's failure to disclose her investigation of witnesses regarding Rainwater's alibi, and (5) the State failing to disclose Plumb's report until 15 minutes before he testified.

Some of the errors Herrin complains of did not occur at, and thus did not affect or prejudice, the third trial. Nuñao Gallegos did not identify Herrin in the third trial, and similarly, the jury from the third trial did not hear Herrin admit to committing robberies in his interrogation. Other errors were remedied with the grant of a new trial. The importance of Maile's testimony lay primarily in his recognizing a person at the scene as connected to Antonio, Herrin's brother, rather

---

[6] Snapchat is a cell phone app similar to text messaging except that photos and texts sent through Snapchat disappear once they are seen by the recipient and are not preserved.

[7] Herrin argues the trial court "never definitively resolved which account was credible regarding the extent of [Maile's] coaching." However, the trial court held that the circumstances of the alleged coaching and staging did not constitute governmental misconduct.

11

than in identifying Herrin in court years later, which the court ultimately prohibited him from doing. Herrin argued he was unfairly surprised by Detective Dvorak's investigation into Rainwater's alibi witnesses, as well as the late disclosure of Plumb's report. Because the court granted a mistrial, Herrin was able to review Plumb's report with adequate time and interview Jasmyn and Karen. Thus, the unfair surprise was remedied. Herrin argues Detective Dvorak's untimely disclosures interfered with his ability to prepare for the State's attack on his other suspect defense. However, the State did not withhold exculpatory evidence, but instead withheld evidence that discredited Herrin's other suspect defense. The remedy of a new trial permitted Herrin to meet these facts without being surprised by them, precisely as he could have done if the State had timely disclosed them from the start.

Herrin further argues that the State "was able to profit from the mismanagement of its case" and "able to leverage a new trial to its advantage by strengthening its case, thereby reaping a reward for its mismanagement." The State presented new evidence at the third trial, including Jasmyn's and Karen's testimony, a doorbell video, which corroborated Herrin's statement that he placed Barreto-Sabalza's phone into a storm drain, testimony that the iPhone recovered from the storm drain was Barreto-Sabalza's phone, and testimony that officers investigated the person Maile referred to as "Antonio" and thereby discovered a link to Herrin. Citing United States v. Chapman, 524 F.3d 1073, 1087 (9th Cir. 2008), and United States v. Bundy, 968 F.3d 1019, 1043-44 (9th Cir. 2020), Herrin

argues that dismissal is an appropriate remedy when any lesser available remedy would unfairly advantage the State.

In Chapman, the Ninth Circuit found that it was not an abuse of discretion to dismiss an indictment after finding that the prosecution engaged in "flagrant misbehavior" that resulted in a mistrial due to violations of Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). 524 F.3d at 1078, 1085, 1088. The district court initially declared a mistrial, and subsequently refused to permit a re-trial, reasoning that the defendants would suffer substantial prejudice because the government and its witnesses would not make the same mistakes again. Id. at 1080. The Ninth Circuit stated that the district court was in the best position to evaluate the strength of the government's case to gauge the prejudicial effect of a re-trial, and concluded that "the district court considered and properly rejected" the argument that a mistrial was an adequate sanction, "because the mistrial remedy would advantage the government, probably allowing it to salvage what the district court viewed as a poorly conducted prosecution." Id. at 1087. Thus, the Ninth Circuit held the district court's ruling was not an abuse of discretion.

In Bundy, the government failed to produce exculpatory evidence that had been requested by the defendants. 968 F.3d at 1026. The district court found that " 'retrying the case would only advantage the government by allowing [it] to strengthen [its] witnesses' testimony based on the knowledge gained from the information provided by the defense and revealed thus far,' " and concluded that dismissal of the indictment was warranted. Id. at 1029 (alterations in original). In concluding that the district court did not abuse its discretion by dismissing, the

13

Ninth Circuit, citing Chapman, highlighted the possibility of the government gaining an advantage from already having tried the case and its ability to identify weaknesses and attempting to correct them in a second prosecution. Id. at 1043-45.

Both Chapman and Bundy involved the government wrongfully withholding information helpful to the defense and arguing theories not needing to deal with the withheld information. Chapman, 524 F.3d at 1079 (the government withheld rap sheets, plea agreements, and other information casting doubt on the credibility of numerous government witnesses); Bundy, 968 F.3d at 1025, 1027 (a "central pillar" to the government's case was that the defendants falsely stated government snipers surrounded their ranch, and it withheld evidence that the government itself had referred to agents observing the ranch as snipers). Had re-trials been allowed, the government would have been allowed to better argue its case in light of the new revelations undermining its original theories. Herrin points to information that was withheld that helped the government's case and was consistent with the theory the government pursued all along. In Herrin's case, the issue was not that he was unfairly deprived of an opportunity to rebut the government's theory, but that he was unfairly surprised by nondisclosure. That failing was adequately redressed by a new trial, with full and fair notice. Further, in both Chapman and Bundy, the Ninth Circuit held that the district court did not abuse its discretion in dismissing the indictment. It did not hold that dismissal was required as a matter of law. Its analysis indicates that a trial court has the discretion to determine what sanction is appropriate, and while usually the appropriate remedy is something

14

short of dismissal, the district courts in those cases nonetheless did not abuse their discretion.

Given that dismissal is a "last resort" and the trial court had a chance to remedy the surprise rather than dismiss the case outright, the trial court acted within its discretion in denying Herrin's CrR 8.3(b) motion to dismiss. See State v. Wilson, 149 Wn.2d 1, 12, 65 P.3d 657 (2003) (noting that the trial court ignored " 'intermediate remedial steps,' " such as excluding testimony, before resorting to dismissal (quoting State v. Koerber, 85 Wn. App. 1, 4, 931 P.2d 904 (1996))).

C

Alternatively, Herrin argues the trial court erred by not suppressing Maile, Karen, and Jasmyn's testimony, as well as Jasmyn's photographs, as a lesser available remedy. We disagree.

We will not disturb the trial court's denial of a motion to dismiss for discovery violations unless the denial constitutes a manifest abuse of discretion. State v. Woods, 143 Wn.2d 561, 582, 23 P.3d 1046 (2001), abrogated on other grounds by State v. Schierman, 192 Wn.2d 577, 739 n.69, 438 P.3d 1063 (2018).

During the second trial, Herrin moved for a mistrial and moved to exclude Maile's testimony because of Detective Dvorak's coaching compounded with the suggestiveness of Maile seeing Herrin walk into the courtroom while handcuffed. The trial court denied a mistrial, held that Maile could not provide an in-court identification of Herrin, and the remedy for Maile's "changing stories" would be

cross-examination.[8]  On the day of the murder, Maile told officers he saw a person driving away from Salt Air Vista Park that he knew to be " 'Antonio's friend' " but whose name he did not know.  As noted, this statement was probative primarily circumstantially because Herrin in fact was Antonio's brother, not because of Maile's ability to identify the person he saw years later.  The statement was given years before Detective Dvorak's alleged coaching and Maile viewed Herrin handcuffed and surrounded by officers.  The remedy the trial court provided— suppressing Maile's in-court identification—was sufficient to remedy any prejudice surrounding the coaching or the staging.  Herrin fails to show that the trial court abused its discretion in declining to exclude Maile from testifying.

Similarly, Herrin fails to show that the trial court's decision to allow Jasmyn and Karen to testify was an abuse of discretion.  Herrin moved to suppress their testimony due to late discovery.  Herrin was unfairly surprised at the second trial by Detective Dvorak's investigation into Rainwater's alibi witnesses, causing the trial court to declare a mistrial.  However, Herrin knew of Jasmyn and Karen as witnesses, as well as the significance of their knowledge, even before the first trial.  And at the time of the third trial, Herrin knew that Detective Dvorak had followed up on Jasmyn and Karen's testimony.  Thus, there was no longer any unfair surprise by allowing both Karen and Jasmyn to testify and admitting Jasmyn's photographs and Snapchat video from the night of the murder.  The trial court did not abuse its discretion by allowing Maile's, Jasmyn's, and Karen's testimony.

---

[8] Herrin argues the trial court abused its discretion by not explicitly ruling on the motion to suppress Maile's testimony.  However, Herrin did not re-raise the motion in the third trial.  Herrin did not preserve the issue for appeal.

III

Herrin argues the State impermissibly commented on his exercise of his right to prearrest silence because it used his decision not to call the police as substantive evidence of guilt. We disagree.

During the second trial, Herrin objected to any evidence that constituted an improper comment on Herrin's prearrest or postarrest exercise of the right to silence, including statements regarding his failure to call 911 when he alleged he saw Rainwater shoot Barreto-Sabalza. The trial court admitted Herrin's statement, "I stayed there for like thirty seconds. I debated, was like should I call the police." The parties relied on this evidentiary ruling for the third trial, and the statement was included in both the admitted audio recording of Herrin's interrogation, as well as the transcript of the interrogation that was published to the jury. During closing argument of the third trial, the State discussed the differing accounts Herrin told the police during his interrogation. While summarizing Herrin's second account, in which Herrin alleged that Rainwater shot Barreto-Sabalza while Herrin was present, the State said,

> Detective Gee says, "Well, did you do anything to try to stop him?" He's like, "Well, I said, 'Hey, man, you don't want to do this.' And then he just points the gun and he shoots her." He said he hesitated about 30 seconds, and then again said the detectives, "Again ran to the car and I just went about my day." Says he thought about calling the police. Didn't.

The Washington state and federal constitutions provide criminal defendants with the right against self-incrimination. State v. Easter, 130 Wn.2d 228, 235, 922 P.2d 1285 (1996). Miranda v. Arizona held pursuant to the self-incrimination

17

clause of the Fifth Amendment that "if a person in custody is to be subjected to interrogation," they must first be informed that they have the right to "remain silent." 384 U.S. 436, 467-68, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Herrin was properly advised of his Miranda rights following his arrest, and made a knowing, intelligent, and voluntary waiver of his Fifth Amendment rights. The trial court ruled that Herrin's statement that he debated calling the police was admissible, and Herrin does not assign error to that ruling on appeal. In its closing argument, the State summarized the differing accounts Herrin told to the police, including the one in which Herrin stated he debated whether to call the police, and discussed why Herrin's account did not match the evidence in the case. The State never argued that Herrin not calling the police before he was arrested suggested his guilt, but argued only that the admissible statements he made to the police did not fit with the evidence and were not believable. When a defendant waives the right to remain silent, the State may draw the jury's attention to the shortcomings in the defendant's story. See State v. McFarland, 73 Wn. App. 57, 64-66, 867 P.2d 660 (1994), aff'd, 127 Wn.2d 322, 899 P.2d 1251 (1995). Furthermore, the State enjoys reasonable latitude in arguing inference from the evidence, including inferences as to witness credibility. State v. Johnson, 40 Wn. App. 371, 381, 699 P.2d 221 (1985). We conclude the State did not comment on Herrin's right to silence, but used Herrin's properly admitted statement to make a proper argument.

IV

Herrin argues the trial court abused its discretion in admitting evidence of Herrin's attempt to elude police to show consciousness of guilt. We disagree.

18

Before the first trial, Herrin moved to exclude reference to his flight from the police before his arrest, and argued that unfair prejudice would outweigh any probative value. Herrin argued he fled because he thought the pursuit was associated with an outstanding warrant due to missing a court hearing that day for an unrelated case. The State argued that even with that alternative reason, another reason Herrin could have been fleeing was because he was in the victim's vehicle. The trial court found the prejudicial effect of the evidence did not outweigh its probative value and ruled that the evidence was admissible.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. State v. Jennings, 199 Wn.2d 53, 59, 502 P.3d 1255 (2022). A trial court abuses its discretion when the exercise of discretion is unreasonable or based on untenable grounds. State v. Barker, 103 Wn. App. 893, 902, 14 P.3d 863 (2000). "A trial court must not automatically allow [flight evidence] but must first decide whether or not the proposed evidence amounts to a reasonable inference of flight that is more than mere speculation and supports a consciousness of guilt inference." State v. Slater, 197 Wn.2d 660, 674, 486 P.3d 873 (2021). The probative value of flight evidence as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. State v. Freeburg, 105 Wn. App. 492, 498, 20 P.3d 984 (2001).

19

Here, three days after Barreto-Sabalza's murder, while driving Barreto-Sabalza's vehicle, Herrin led police officers on a several-minute, high speed chase, on local streets. An officer testified to traveling an estimate of 80 miles per hour and noted that Herrin was "pulling away from [him]." Officers were forced to use a pursuit immobilization technique to stop the vehicle. Herrin argues the evidence merely shows that he fled from police because of his outstanding warrant in an unrelated matter. However, the evidence also supports the inference that Herrin fled from police for the much more serious purpose to avoid being caught driving Barreto-Sabalza's vehicle. The trial court did not abuse its discretion in admitting Herrin's flight from the police to show consciousness of guilt.

V

Herrin argues cumulative error violated his due process right to a fair trial. Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). However, the doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial. Id. Because there were no errors here, we reject Herrin's cumulative error argument.

VI

Herrin argues the community custody condition requiring him to remain within "geographic boundaries, as set forth in writing by the Department of Corrections Officer or as set forth with [Stay Out of Drug Area] order" is unconstitutionally vague. We recently addressed the same community custody condition in State v. Lundstrom, __ Wn. App. 2d ___, __ P.3d __ (2025), No.

20

86537-4-I, slip op. at 1 (Wash. Ct. of Appeals July 28, 2025), https://www.courts.wa.gov/opinions/pdf/865374.pdf, and concluded the condition was not unconstitutionally vague. For the reasons set forth in Lundstrom, we conclude the geographic boundaries condition is not unconstitutionally vague.

Affirmed.

_____
Birk, J.

WE CONCUR:

_____          _____
Chung, J.                                          Mann, J.